[Cite as *In re P.G.*, 2016-Ohio-1433.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | CASE NOS. CA2015-01-009 |
| P.G. | : | CA2015-01-010 |
|  | : | O P I N I O N<br>4/4/2016 |
|  | : |  |
|  | : |  |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 14-D000006

Sarah N. Fox, P.O. Box 8029, West Chester, Ohio 45069, guardian ad litem

Tamara S. Sack, 9435 Waterstone Blvd., Suite 140, Cincinnati, Ohio 45249, attorney for child

Tyrone P. Borger, 24 Remick Blvd., Springboro, Ohio 45066, for appellant, B.D.

Kaufman & Florence, Wm. Robert Kaufman, 144 East Mulberry Street, P.O. Box 280, Lebanon, Ohio 45036, for appellant, H.G.

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for appellee, Warren County Children Services

**PIPER, P.J.**

{¶ 1} Appellants, B.D. and H.G., appeal a decision of the Warren County Court of Common Pleas, Juvenile Division, granting legal custody of their child, P.G., to the child's maternal aunt.

**{¶ 2}** In late 2013, emergency medical personnel and law enforcement responded to the home of B.D. ("Mother") and H.G. ("Father") based upon a 9-1-1 call reporting an unresponsive infant. The responders found P.G., who was two months old at the time, breathing on her own. P.G. was ultimately transported to the pediatric Intensive Care Unit at Children's Hospital in Cincinnati where doctors discovered that P.G. had suffered head trauma, a possible fractured leg, bruising on her left cheek below her eye and inside her ear, as well as retinal hemorrhaging. Medical personnel determined that the injuries had occurred within the last 12-24 hours.

**{¶ 3}** During the timeframe when P.G.'s injuries occurred, her only caregivers were Mother and Father. As such, Warren County Children's Services ("the Agency") assumed emergency shelter care of P.G., and she was later placed with R.R. (Aunt) in Toledo, Ohio. The complaint filed by the Agency alleged that P.G. was an abused child, and the Agency later requested that either legal custody be granted to Aunt or temporary custody be granted to the Agency. Father and Mother opposed Aunt having legal custody, and instead suggested that family friends have custody of P.G. if reunification was not to occur.

**{¶ 4}** Mother moved the juvenile court to provide $3,500 in expert witness fees plus expenses for a neurologist to be used at the adjudicatory hearing to support Mother and Father's contention that P.G. was not abused. The juvenile court, however, denied the motion, finding that the civil nature of the proceedings did not entitle P.G.'s parents to an expert witness at the state's expense.

**{¶ 5}** A magistrate of the Warren County Juvenile Court held an adjudicatory hearing. The state presented testimony from the pediatrician who treated P.G. when she was first taken to the hospital. The pediatrician testified that she is a specialist in child abuse, and has incurred additional qualifications and training to receive such certification. She also testified that she has treated "thousands" of children who exhibit possible signs of abuse, and that her

diagnosis of those children has included accidental injury, medical conditions that mimic child abuse, as well as actual child abuse.

{¶ 6} According to the pediatrician, P.G. had bruising on her left cheek and inside her outer ear, and testing revealed that P.G. had suffered a subdural hematoma. The testing showed that P.G. had subdural bleeding between her skull and brain, and that her brain was swelling. Medical testing also revealed that P.G. had suffered severe retinal hemorrhaging, with a hemorrhage appearing on each of the seven layers of the baby's retina.

{¶ 7} The pediatrician also testified that when she asked Mother and Father for P.G.'s history, Father responded that several hours before the baby became unresponsive, he had bounced her on a yoga ball to sooth her fussing. Father stated that this technique did not work, and that he held the baby in his arms while working on a computer. Father stated that within a few minutes of holding P.G., she went limp and that he tried to revive her. When his efforts failed, Father called 9-1-1.

{¶ 8} Father also told the pediatrician that in the recent past, P.G. was sleeping on his chest when the family cat startled the baby, causing P.G. to raise her head off of his chest and put it back down. Father suggested that his incident may have caused P.G.'s bruises. Father also told the pediatrician that he had recently fallen backwards down the steps while cradling P.G., but that she did not seem to be in any pain or distress from his fall.

{¶ 9} The pediatrician testified that none of the explanations offered by Father would be sufficient to cause P.G.'s injuries, and that the bruising to P.G.'s face and ear were indicative of nonaccidental injury or physical abuse. The pediatrician concluded within a reasonable degree of medical certainty that P.G.'s injuries were a result of physical abuse or nonaccidental trauma.

{¶ 10} The state also presented testimony from an officer with the Mason Police Department who testified that he investigated the allegation of child abuse regarding P.G.

The officer testified that he spoke with Father, and that Father told him the same story of bouncing the baby on a yoga ball when she became fussy, and that Father stated that he could have bounced P.G. "too hard." Mother spoke with the officer and offered no possible explanation for P.G.'s injuries.

{¶ 11} The magistrate determined by clear and convincing evidence that P.G. was an abused child, and the juvenile court adopted the magistrate's decision. During the dispositional hearing, the state offered testimony from the Agency's ongoing case worker assigned to P.G.'s case. The case worker testified that she drafted a case plan for Mother and Father, with services that included psychological evaluations, parenting classes, child abuse awareness class, and anger management classes. The case worker testified that Mother and Father had almost completed the entire case plan, save anger management classes.

{¶ 12} Even so, the case worker testified that she had ongoing concerns about reunifying P.G. with Mother and Father, such as the need to learn the identity of the perpetrator. Without knowing who had caused the abuse, the Agency could not determine what exact services were needed to ensure that P.G. would be safe if returned to Mother and Father's care.

{¶ 13} Aunt also testified, and stated that she is a nurse in a neonatal intensive care unit, and that P.G. had been living with her and her family in Toledo since the abuse first came to light. Aunt testified that P.G. required medicine for pain and to control seizures, and that she was in a harness for the leg fractures when the baby first came to stay with her in Toledo. Aunt also testified that P.G. requires ongoing physical and occupational therapy to address delays she suffers. It is undisputed that P.G. is doing well with Aunt's family, and that P.G. has become bonded to Aunt, as well as Aunt's husband and child.

{¶ 14} Father then testified, and asserted his Fifth Amendment right against self-

- 4 -

incrimination when asked how the abuse occurred. Father also asserted his rights when asked if any of the case plan services had made it less likely that P.G. would receive injuries in the future. Even so, Father testified that he did not believe that Mother caused the abuse.

{¶ 15} Mother then testified, also asserting her Fifth Amendment right against self-incrimination when asked about the abuse and whether it was likely that P.G. would be spared injury in the future. Mother, however, testified that in the days leading up to P.G. being taken to the hospital, only she and Father were P.G.'s caregivers.

{¶ 16} The magistrate found that it was in P.G.'s best interest to remain in Aunt's care, and that Aunt be given legal custody of the child. Mother and Father filed objections to the magistrate's decision. The juvenile court overruled Mother and Father's objections, and adopted the magistrate's decision in full. Mother and Father now appeal the juvenile court's decision that P.G. was an abused child, and the decision to grant legal custody of P.G. to Aunt, raising the following assignments of error. Even though Mother and Father filed separate briefs, we will combine their assignments of error when proper, and for ease of discussion.

{¶ 17} Mother's Assignment of Error No. 1:

{¶ 18} THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR FEES TO PAY FOR AN EXPERT WITNESS.

{¶ 19} Father's Assignment of Error No. 1:

{¶ 20} THE TRIAL COURT ERRED BY DENYING FATHER'S REQUEST FOR FUNDS TO HIRE AN EXPERT WITNESS.

{¶ 21} In their first assignments of error, Mother and Father argue that the juvenile court erred by not providing fees to secure an expert witness.

{¶ 22} Mother and Father argue that the trial court abused its discretion by refusing the request for $3,500 to pay for an expert witness to discount the pediatrician's testimony that

P.G.'s injuries were the result of abuse. Even so, there is no law, statute, or civil rule that entitles a parent to have funds appropriated by the court for expert witnesses when legal custody of a child is at issue.

{¶ 23} Instead, Mother argues that this court should apply the standard set forth in criminal cases specific to when a trial court abuses its discretion in denying an appropriation of funds for an expert. "In resolving a request for funding for expert fees, courts have reviewed the expert's value to the defendant's proper representation at trial and the availability of alternative devices that fulfill the same functions as the expert assistance sought." *State v. Vore*, 12th Dist. Warren No. CA2011-08-093, 2012-Ohio-2431, ¶ 53.

{¶ 24} Father argues that the juvenile court's denial of the expert fees deprived him of due process of law. Father offers a test for determining whether parental due process rights have been infringed, as set forth in *In re Sprague*, 113 Ohio App.3d 274 (12th Dist.1996). Therein, this court looked at the private interest affected, the risk of erroneous deprivation and the probable value of additional safeguards, as well as the governmental burden of additional safeguards. *Id.* at 276.

{¶ 25} Regardless of the legal standard applied, we find that the trial court did not abuse its discretion in denying the request for expert fees. The record indicates that Mother and Father wanted an expert to establish reasons for or causes of P.G.'s injuries other than physical abuse. Specifically, Mother and Father contend that an expert would have been able to offer testimony to contradict the pediatrician and other medical doctors regarding the nature of P.G.'s injuries and how they may have occurred. Mother and Father argue that this contradictory testimony would have discredited P.G.'s treating pediatrician, and thus demonstrated the state's inability to prove that P.G. was abused.

{¶ 26} However, there is no indication in the record that the only way Mother and Father would be able to cast doubt upon the state's theory of the case was by having an

expert funded by the court.  Instead, the record indicates that the pediatrician was thoroughly cross-examined regarding her diagnosis, and that her opinions were challenged by counsel for Mother and Father.

{¶ 27} For example, the juvenile court heard testimony that the pediatrician diagnosed P.G. with fractures in her legs based upon initial x-rays first taken when the baby came to the hospital.  However, when the x-rays were re-administered at a later date, there were questions as to whether the fractures actually occurred, or to what degree.  As a result, the state's expert became less definite regarding her original opinion.  Both Mother and Father's attorneys honed in on this issue, and appropriately used it in an attempt to establish that the pediatrician's diagnoses and testimony lacked credibility.

{¶ 28} Moreover, the pediatrician was thoroughly cross-examined regarding other reasons why cerebral and retinal hemorrhaging may occur, such as illness or heredity.  The pediatrician was also challenged through cross-examination regarding the testing and procedures she chose to use in order to establish the cause of injury, thus bringing into question whether the hospital took proper measures to accurately diagnose the cause of injury.

{¶ 29} The magistrate and juvenile court, therefore, had before it ample evidence in regard to how and why P.G.'s injuries occurred.  This would have been the equivalent information and evidence that an expert could have provided on behalf of Mother and Father.  As such, neither Father nor Mother has established that an expert was necessary to provide particularized information as to why P.G. was not an abused child.

{¶ 30} Father also argues that he was denied effective assistance of counsel due to the denial of expert witness fees.  Essentially, Father argues that without an expert witness, his attorney could not prove that the child was not abused.

{¶ 31} In order to prove ineffective assistance of counsel, one must demonstrate that

his counsel's performance was deficient and that such deficient performance prejudiced the defense so that the results of the trial would have been different absent counsel's unprofessional errors. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

{¶ 32} However, there is no indication that counsel's representation was deficient where the juvenile court was clearly asked to provide expert fees, and such request was denied. The fact that the request was denied, however, does not make the representation deficient. *See State v. Mason*, 82 Ohio St.3d 144 (1998) (neither the federal nor state constitutions establish a per se rule requiring a court to grant an indigent defendant's request for any and all expert witness fees or to fund a battle of the experts).

{¶ 33} Nor is there any indication in the record that the results of the adjudication would have been different had an expert testified on behalf of Mother and Father. As stated above, the information regarding other reasons for P.G.'s injuries was presented to the court through cross-examination, and testimony from an expert would have been cumulative in nature. As such, Father has failed to prove that he received ineffective assistance of counsel.

{¶ 34} After reviewing the record, we find that neither Father nor Mother was prejudiced by the juvenile court's decision to deny their request for expert fees. As such, Mother and Father's first assignments of error are overruled.

{¶ 35} Father's Assignment of Error No. 2:

{¶ 36} THE TRIAL COURT ERRED BY FINDING THE CHILD TO BE AN ABUSED CHILD UNDER R.C. §2151.031(B) and R.C. §2151.031(C).

{¶ 37} Mother's Assignment of Error No. 3:

{¶ 38} THE TRIAL COURT'S DETERMINATION THAT THE CHILD WAS ABUSED IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 39} Mother and Father argue in their second and third assignments of error that the

juvenile court erred in finding P.G. an abused child.

{¶ 40} R.C. 2151.031(B) provides that a child is abused if he or she is "endangered" by a parent creating a substantial risk to the health or safety of the child. According to R.C. 2151.031(C), an abused child is also defined as one who "exhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it."

{¶ 41} A trial court's determination that a child is abused, neglected or dependent must be supported by clear and convincing evidence. R.C. 2151.35(A). Clear and convincing evidence is evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re S.J.J.*, 12th Dist. Butler No. CA2006-02-021, 2006-Ohio-6354, ¶ 11. Even if a trial court's judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence. *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 9.

{¶ 42} "Weight of the evidence concerns the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its *effect in inducing belief*." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12. (Emphasis sic.) In considering a challenge to the manifest weight of the evidence, the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re S.M.* at ¶ 10.

{¶ 43} In weighing the evidence, a reviewing court must be mindful of the presumption in favor of the finder of fact. *Id.* In determining whether the trial court's decision is manifestly against the weight of the evidence, "every reasonable intendment and every reasonable

presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Id.*

{¶ 44} When reviewing a trial court's decision on a manifest weight of the evidence basis, an appellate court is guided by the presumption that the findings of the trial court were correct so that reversing a judgment on manifest weight grounds should only be done in exceptional circumstances, when the evidence weighs heavily against the judgment. *In re G.S.*, 12th Dist. Franklin No. 05AP-1321, 2006-Ohio-2530, ¶ 4.

{¶ 45} As previously stated, the juvenile court heard extensive testimony and evidence regarding P.G.'s injuries and how they occurred. Most of the testimony came from the pediatrician who treated P.G. when the baby first came to the hospital after being reported as unresponsive. The pediatrician, who specializes in diagnosing the cause of a child's injuries, testified that in her medical opinion, P.G.'s injuries were caused by physical abuse.

{¶ 46} Specifically, the pediatrician testified that she observed bruises on the baby's cheek and inside portion of her ear. The baby also had subdural bleeding and brain swelling, which caused a portion of the baby's brain to push itself "onto the other side of the brain past the midline." When asked the significance of the subdural hematoma on a child of two months, the pediatrician testified that such injuries are significant because "there aren't that many causes for uh a subdural bleed. Uh the biggest cause in children is trauma." The pediatrician testified that when a child, such as two-month-old P.G., is too young to move around or participate in activities that could normally cause trauma, such as skateboarding or playing outside, the potential for a non-accidental trauma diagnosis is much greater.

{¶ 47} Even so, the pediatrician offered other explanations for why and how subdural bleeding can occur with babies, such as: bleeding disorders like hemophilia, a family history

of bleeding disorders, meningitis, or bleeding caused by being birthed. The pediatrician testified that she considered each of the other possible sources for the subdural hematoma, and discredited each. "So I was able to uh and as part of my assessment[,] I always look for other causes of subdurals when I find them but we were quickly able to rule out * * * other causes."

{¶ 48} First, the pediatrician noted that all of the testing done on the child to determine if she had bleeding disorders failed to show any such disorder, and that the testing was "all normal." Regarding the family history, neither parent had any indication of a family history of bleeding disorders, and the child's history since her birth did not indicate that she had a bleeding disorder. The pediatrician further ruled out meningitis because the child did not have a fever or elevated white blood cell count, which are regular indicators of the illness. Nor did the symptoms indicate that P.G. had subdural bleeding since birth, as the testing revealed that the injury was new, rather than two months old.

{¶ 49} The pediatrician next addressed Father's explanations for how some of the injuries may have occurred. Father told the pediatrician that the family cat had startled P.G. and caused her to essentially bump her head against his chest, and possibly his chin, while he was holding her. However, the pediatrician testified that such motion could not have caused a subdural hematoma, or the other injuries, such as the bruising. Instead, the pediatrician testified that P.G. was too young to generate enough force to cause a bruise to her cheek by lifting her head and making contact with Father's chest or chin. Moreover, bruising to the inner ear is not an area where accidental injury occurs, especially under the circumstances described by Father.[1]

---

1. The pediatrician also testified that the ear bruising did not occur as a result of medical testing. An expert for Mother and Father indicated in a report that medical personnel may have pinched the baby's inner ear to see if she was responsive. However, the pediatrician testified that she and her colleagues had never heard of such a

**{¶ 50}** The pediatrician also testified that Father's falling backward onto a stair could not have caused the baby's injuries, as such injuries were newer and showed a "quick progression" between the child's first and second CAT scans, and were inconsistent with injuries that would have occurred several days before when the fall allegedly occurred.

**{¶ 51}** The pediatrician also testified about P.G.'s ophthalmologic examination, and that the baby's right eye had hemorrhaging on every layer of the retina. The pediatrician explained that the back-inside portion of the eyeball, which covers 60-70 percent of the back of the eye, is called the retina and is where all of the nerves come through to transmit vision to the brain. The retina contains numerous blood vessels within its seven layers. Retinal hemorrhages are "basically bleeding" within the retinal layers in the back of the eye. Each of P.G.'s seven retinal layers had hemorrhaged.

**{¶ 52}** Similar to the subdural hematoma, the pediatrician offered other reasons as to why hemorrhages may occur, such as meningitis, leukemia, bleeding disorders, and birth-related bleeding. Like P.G.'s subdural hematoma, all other reasons were ruled out either by medical testing or the baby's history. The pediatrician testified that P.G.'s hemorrhages went "all the way out to the periphery" of the eyeball, and that there were "many, many retinal hemorrhages." The significance of the amount and placement of the hemorrhages were "very important" to the pediatrician's diagnosis, and she testified that such hemorrhaging had "only ever been reported in very significant traumas."

**{¶ 53}** The pediatrician also testified that an initial x-ray of P.G. indicated that she had suffered a fracture of her distal tibia, a bone in the lower leg by the ankle. The initial indication was that P.G. also had two fractures in the lower femur, the bone nearest the thigh. The pediatrician testified that fractures such as the ones initially indicated are called

---

test, and even if the practice was used by some medical personnel, the baby was responsive upon coming to the hospital so that such testing would not have been performed.

metaphyseal fractures, and that such breaks do not show signs of swelling or pain. One month later, another set of x-rays were taken. The radiologist who read the first set of x-rays also read the second, and observed "less conspicuous" indications of fracture and concluded that "healing had occurred." Based on the x-ray readings, the pediatrician testified that she was not "convinced" that P.G. suffered from metaphyseal fractures, but that her not being convinced of the fractures did not change her opinion regarding the subdural hematoma, the bruising, or the retinal hemorrhaging.

{¶ 54} Based on all of the medical testing and her years of experience determining the difference between accidental injury and physical abuse, the pediatrician testified that her opinion, within a reasonable degree of medical certainty, was that P.G.'s injuries were caused by "physical abuse or non-accidental trauma."

{¶ 55} The state also presented testimony from a detective who investigated the alleged abuse. The detective testified that he interviewed Father at the hospital and that Father also indicated that he had bounced the child on a yoga ball in order to sooth her fussing. Father told the detective that after he picked the child up and began working on the computer, the child became limp and was "laying there comatose." When the detective asked Father how the injuries could have occurred, Father indicated that he may have bounced P.G. "too hard."

{¶ 56} The detective also interviewed Mother at the hospital. The detective testified that when he spoke with Mother, she was "agitated" but not "surprised" that he was asking her questions. When the detective asked Mother for a possible explanation for the injuries, Mother "had none." Even so, Mother admitted that in the week prior to the incident in question, P.G. was not under anyone else's care, other than her and Father.

{¶ 57} After reviewing this evidence, we find that there was clear and convincing evidence that P.G. was an abused child as that term is defined in the applicable statute. The

state presented evidence that P.G. suffered a subdural hematoma, retinal hemorrhaging, and unexplained bruising, all of which were not attributable to any accident or incident that Father offered to explain the injuries. Despite thorough cross-examination of the state's witnesses, we find that the juvenile court's adjudication was not against the manifest weight of the evidence. As such, Mother and Father's assignments of error are overruled.

{¶ 58} Mother's Assignment of Error No. 2:

{¶ 59} THE TRIAL COURT ERRED BY FAILING TO EXPLORE REUNIFICATION OF THE CHILD WITH APPELLANT.

{¶ 60} Father's Assignment of Error No. 3:

{¶ 61} THE TRIAL COURT ERRED BY AWARDING LEGAL CUSTODY TO THIRD PARTIES.

{¶ 62} Mother and Father argue in their second and third assignments of error that the juvenile court erred by awarding legal custody of P.G. to Aunt instead of reunifying the child with them or giving custody to a family friend.

{¶ 63} According to R.C. 2151.353(A)(3), once a child is adjudicated abused, the juvenile court may award custody of the child to a person who, before disposition, has filed a motion requesting legal custody. Though the statute does not expressly set forth criteria that a juvenile court must consider when awarding legal custody, courts have agreed that the decision must be based on the best interest of the child. *In re X.B.*, 12th Dist. Butler No. CA2014-07-168, 2015-Ohio-1174, ¶ 18; *In re Fulton*, 12th Dist. Butler No. CA2002-09-236, 2003-Ohio-5984, ¶ 11.

{¶ 64} Because the best interest of the child is the paramount concern, the juvenile court should consider the totality of the circumstances affecting the best interests of the child. *In re M.A.*, 12th Dist. Butler No. CA2011-02-030, 2012-Ohio-545, ¶ 16. Although there is no statutory mandate that the factors in R.C. 3109.04(F) be expressly considered and balanced

- 14 -

before fashioning an award of custody pursuant to R.C. 2151.353(A)(3), a juvenile court may consider those factors, as well as any other relevant factors, in making its custody determination. *In re Fulton* at ¶ 11.[2]

{¶ 65} An appellate court reviews a juvenile court's custody determination for an abuse of discretion. *In re S.K.*, 12th Dist. Butler No. CA2013-06-108, 2014-Ohio-563, ¶ 12. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *In re B.K.*, 12th Dist. Butler No. CA2010-12-324, 2011-Ohio-4470, ¶ 12. The discretion which a juvenile court enjoys in custody matters "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re J.M.*, 12th Dist. Warren No. CA2008-12-148, 2009-Ohio-4824, ¶ 17. Thus, "an appellate court affords deference to a judge or magistrate's findings regarding witnesses' credibility." *In re T.M.*, 12th Dist. Butler No. CA2007-01-019, 2007-Ohio-6034, ¶ 27.

{¶ 66} The record indicates that Mother and Father want custody of the child, and opposed granting legal custody of the child to Aunt. Or, in the alternative, Mother and Father wanted family friends to have custody of P.G. so that they could be closer to her. Mother and Father argue that returning the child to their care is in her best interest, and assert that they have demonstrated as much by completing most aspects of their case plan. Even so, the purpose of the case plan was to remediate the original conditions that caused P.G. to be removed from Mother and Father's care, which had not occurred at the time of the

---

2. These factors include: (a) the wishes of the parents, (b) the child's wishes and concerns, if interviewed, (c) the child's interaction and interrelationship with other family members or others who may significantly affect the child's best interest, (d) the child's adjustment to home, school and community, (e) the mental and physical health of all persons involved, (f) the likelihood that the caregiver would honor and facilitate or had honored and facilitated visitation and parenting time, (g) whether support orders have been followed, (h) whether household members or parents have been convicted or pled guilty to certain offenses or caused a child to be adjudicated abused, (i) whether either parent has willfully denied visitation in accordance with a court order, and (j) whether a parent intends to establish an out-of-state residence.

dispositional hearing.

**{¶ 67}** It is well-established that a parent's completion of case plan services does not equate to, or compel a finding that the parent has substantially remedied the conditions that caused the removal of the child from the home. *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122. Instead, "a parent can successfully complete the requirements of a case plan, but not substantially remedy the conditions that caused the children to be removed, as the case plan is simply a means to a goal, but not the goal itself." *Id.* at ¶ 30.

**{¶ 68}** The record is clear that the case plan was designed to ensure that P.G. would be safe and not subject to further abuse. However, neither Mother nor Father would address or confirm the way in which P.G. was injured, and thus, there was no progress made in that regard when Mother and Father worked their case plan. Moreover, neither Mother nor Father even acknowledged that P.G. was physically abused, thus refusing to recognize the original conditions that caused P.G.'s removal.

**{¶ 69}** The ongoing caseworker testified that as part of Mother and Father's case plan, both were to complete psychological evaluations and follow any and all recommendations that came from the evaluations, which included ongoing counseling for both. Mother and Father were also to attend parenting classes, child abuse awareness classes, anger management classes, work with the caseworker, and be compliant with the Agency.

**{¶ 70}** While Mother and Father completed almost every aspect of the case plan, they refused to talk with the caseworker about the abuse leading to P.G.'s adjudication as an abused child. When the caseworker tried to talk to Mother and Father about the incident that caused P.G.'s injuries, both refused to speak about it, indicating that their attorneys "wouldn't want them to talk about that." As a result of Mother and Father's refusal to discuss the abuse, the caseworker testified, "we don't know who the perpetrator of that abuse is. So, it's

hard to link exact services to * * * make myself comfortable that the child is safe* * *."

{¶ 71} This court has previously considered a similar situation, and found that placing an abused child back with her mother and father was not proper where no services could be offered to combat the reasons for the child's injuries without knowing how the injuries occurred. *In re M.A.P.*, 12th Dist. Butler Nos. CA2012-08-164 and CA2012-08-165, 2013-Ohio-655. In *M.A.P*, this court determined, "as both Mother and Father admitted that they were the child's only caregivers, and would not otherwise explain how the child received her extensive injuries, placing the child with Mother or Father would be contrary to her health and safety concerns and therefore also contrary to the overriding goal of the case plan." *Id.* at ¶ 34. The same considerations apply to the case at bar.

{¶ 72} The record clearly indicates, and it is not in dispute, that Mother and Father were P.G.'s only caregivers during the time that she suffered her injuries. Neither Mother nor Father would explain the injuries to the Agency so that a tailored case plan could be formulated to address the specific issues that gave rise to the baby's injuries. Like *M.A.P.*, returning P.G. to her parents without first addressing the circumstances of her abuse would be placing her "in an environment where she was seriously injured as a helpless infant." *Id.* at ¶ 36. The ongoing caseworker testified specifically to these issues and their impact on the Agency's recommendation that legal custody be granted to Aunt.

> I have concerns already because of the injures that occurred and not knowing how they occurred or who inflicted them[.] [I]f we're not able to address through case plan services further or in counseling or by removing one parent from the home or we just don't know how to address them. I can't alleviate the safety threat when I don't know what the safety threat specifically is or who it involves.

{¶ 73} The ongoing caseworker testified that since P.G.'s placement with Aunt in Toledo, she has been safe and well-cared for. Aunt, a neonatal intensive care nurse, has cared for P.G. since her release from the hospital. P.G. received medicine and medical care

to treat her injuries, and has been receiving ongoing services in Toledo to help with long-term recovery.

{¶ 74} Aunt, her husband, and their child have become very bonded to P.G., and the family facilitates visitation between Mother and Father and P.G. on an ongoing basis, including video chats multiple times a week. Aunt also testified that she and her family are willing to continue caring for P.G., and that they are willing to do so indefinitely. The record is undisputed that P.G. is happy, healthy, well-adjusted, and well-cared for in Aunt's home.

{¶ 75} During the disposition hearing, Mother and Father focused much of their presentation of evidence and testimony on the fact that Mother and Aunt have had communication issues in the past. The record indicates that Aunt disagreed with the state's decision not to charge Mother or Father with abuse, and that Aunt believes that either Mother or Father abused P.G. Even so, the ongoing caseworker testified that Aunt has always complied with Agency directions, and that Aunt and Mother's communication had improved since P.G. was first placed in Aunt's care. Aunt also testified that her communication was improving with Mother, and that she had since decided to stop focusing on her belief that Mother and Father needed to take responsibility for P.G.'s abuse. After reviewing the record, there is no indication that Aunt would deny Mother and Father visitation with P.G. or disregard or disobey court ordered visitation just because of past communication issues or her reasonable belief that Mother and Father should have taken responsibility for P.G.'s abuse.

{¶ 76} Mother and Father wanted custody of P.G. placed with family friends who lived near their home. The record indicates that the family friends stated their belief multiple times that neither Mother nor Father perpetrated P.G.'s abuse. During the testimony of one of the family friends, she indicated that the reason she and her husband wanted custody of P.G. was so that Mother and Father "could be a big part of [P.G.]'s life." The family friend also

testified that she would not have any objection or concern with Mother and Father being with P.G., and that P.G. would be "absolutely safe" with Mother and Father. The family friend also testified that she would permit overnight visits between Mother and Father and P.G. because "she belongs with her parents and I don't see why she shouldn't be around them." While there is no indication in the record that the family friends would have denied court orders, there was also no indication that the family friends understood or acknowledged P.G.'s adjudication as an abused child or the need to keep her safe from the perpetrators of her abuse.

{¶ 77} Moreover, the record indicates that the family friends had seen P.G. approximately four to five times in the two months in which she was in Mother and Father's care, but had not seen her at all in the ten months she was in Aunt's care. Despite being invited to Toledo numerous times to visit the child and see if they could bond, the family friends were unable to visit or see P.G., and would have thus been virtual strangers to P.G. at the time of the disposition hearing.[3]

{¶ 78} After reviewing the entire record, we find that the juvenile court properly determined that custody with Aunt is in the child's best interest. Considering all of the testimony and evidence, the record is clear that P.G. suffered abuse from either Mother or Father, and that neither are willing to guarantee the child's safety by procuring services to ensure that such abuse does not occur in the future. The child has recovered well while in Aunt's custody, and she is bonded to Aunt, Aunt's husband, and Aunt's child. P.G. is receiving proper care and medical attention while in Aunt's care, and she continues to work on long-term recovery and to correct her developmental delays. Taking the child from the

---

3. Moreover, and according to R.C. 2151.412(H)(2), the preferred placement of a child when parents and an agency are implementing a case plan is with a "suitable member of the child's extended family." Nonrelative caregivers should be considered if the child "has no suitable member of the child's extended family to accept legal custody." R.C. 2151.412(H)(3).

loving and nurturing environment with Aunt's family and placing her with Mother and Father's family friends, who have no relationship to the child and were essentially strangers to the child, would not be in the child's best interests. As such, Mother and Father's final assignments of error are overruled.

{¶ 79} Judgment affirmed.

S. POWELL and HENDRICKSON, JJ., concur.