[Cite as *In re Y.R.*, 2021-Ohio-1858.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN RE:                                    :

    Y.R.                                  :          CASE NO. CA2020-09-057

                                          :          O P I N I O N
                                                          6/1/2021

                                          :

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20-D000029

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee

KL Hurd Law, LLC, Kenyatta Hurd, P.O. Box 43054, Cincinnati, Ohio 45243, for appellant

**BYRNE, J.**

{¶1}   The Warren County Court of Common Pleas, Juvenile Division, adjudicated Y.R., the biological child of Mother, to be a dependent child. The court also continued a grant of temporary custody of Y.R. to Warren County Children Services ("WCCS" or "the agency"). Mother appeals both the dependency adjudication and the custody disposition. We affirm for the reasons stated below.

**A.  Factual and Procedural Background**

{¶2}   Mother has a history of substance abuse problems and mental health issues. Mother has two daughters, Y.R. and A.B, who have different fathers. Y.R. was 12 and 13

years old and A.B. was 17 years old at the time of the key events in this case. Mother only appealed the juvenile court's adjudication of Y.R. as dependent and its dispositional decision to award temporary custody of Y.R. to WCCS. Mother did not appeal the juvenile court's adjudication of A.B. as dependent or its disposition keeping A.B. in the custody of her father, but we will discuss A.B. when appropriate in order to describe events involving Y.R. Mother also has an adult son, who is not involved in this case.

{¶3} The witness testimony in this case was offered across several hearings. Two juvenile court magistrates and the juvenile court judge made factual findings across several decisions. Because only some of the testimony was available to the magistrates and the judge at different stages of the proceedings, we will not explain all of the testimony at once. Instead, we will specifically reserve detailed summary of the testimony offered at the adjudicatory hearing and the dispositional hearing for our analysis of Mother's assignments of error regarding those proceedings.

### 1. Complaint, Emergency Shelter Care Hearing, and Decision

{¶4} On March 11, 2020, WCCS filed a complaint alleging that Y.R., then nearly 13 years old, was a dependent child pursuant to R.C. 2151.04(B) and (C). WCCS also filed a nearly identical complaint regarding A.B., who was then 17 years old.

{¶5} The complaint made the following allegations regarding Mother. WCCS alleged that Mother had relapsed on methamphetamine and was emotionally unstable. In early January 2020, Mother was pulled over for a traffic violation which resulted in her vehicle being impounded. In her conversation with the officers, Mother stated that she was unable to financially provide for her children. At the time, Mother was already seeking substance abuse counseling at Talbert House. As a result of this exchange, WCCS became involved. Mother shared her substance abuse and mental health issues with WCCS. Mother also admitted that she used methamphetamine on a daily basis. Mother agreed to

participate in WCCS's START program. However, Mother was unable to maintain sobriety. Mother was recommended for inpatient treatment and was supposed to attend mental health therapy and take medication but was not compliant with her treatment recommendations. Mother informed WCCS that she planned to move back to California to get away from her problems in Ohio.

{¶6} The complaint further alleged that A.B. and Y.R. were both exhibiting behavioral problems at school. A.B. had admitted to frequent marijuana abuse and self-harming behaviors, and Y.R. was also engaging in self-harming behaviors. In sum, WCCS alleged that Mother was unable to properly parent her children given her ongoing drug abuse and mental health issues. The complaints requested that the court place Y.R. and A.B. in the temporary custody of WCCS.

{¶7} The juvenile court held an emergency shelter care hearing on the same day the agency filed the complaint. The only witness was WCCS caseworker Laney Foster, whose testimony is described below as part of our discussion of Mother's second assignment of error. Mother, who had been arrested earlier that day for threatening to kill Foster when Foster informed her that WCCS planned to seek custody of her daughters, was not present at the emergency care shelter hearing.

{¶8} Based on Foster's testimony, the magistrate granted temporary custody of Y.R. and A.B. to the agency. The magistrate found that the children were "at risk by virtue of Mother's illegal drug usage, refusal to continue her treatment including taking medications, and the children's behavioral problems." In the same order, the magistrate ordered Mother to (1) complete a drug and alcohol evaluation, (2) submit to random drug screens, (3) complete a mental health evaluation with Solutions Community Counseling and Recovery Centers, and (4) "execute requisite release[s] of information." The magistrate permitted Mother to have visitation with Y.R. and A.B. as arranged and supervised by

WCCS. The record reflects that a copy of this judgment entry was served personally on Mother.

## 2. Rehearing and Decision

{¶9} Mother subsequently moved the juvenile court to release Y.R. from shelter care and to hold a rehearing pursuant to Juv.R. 7(G). On April 3, 2020, the court held the rehearing at Mother's request. Foster testified again and reiterated much of her testimony from the original shelter care hearing. The court also heard Mother's testimony.

{¶10} After hearing the testimony, the magistrate ordered Y.R. and A.B. to remain in the temporary custody of WCCS, and found that Y.R. was "at risk by virtue of the reasons previously stated in the emergency shelter care order journalized on March 11, 2020."

## 3. Adjudicatory Hearing and Adjudicatory Decision

{¶11} On May 21, 2020, a different magistrate conducted an adjudicatory hearing. The purpose of the hearing was to determine if Y.R. and A.B. were dependent children as of the date the complaint was filed, March 11, 2020. Foster's testimony covered the same ground as her testimony in the emergency shelter care hearing and the rehearing. Mother was present but chose not to testify.

{¶12} On May 27, 2020, the magistrate issued a written adjudication decision finding by clear and convincing evidence that Y.R. and A.B. were dependent children under R.C. 2151.04(C), which concerns children "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship* * *." In support of this adjudication, the magistrate noted that Mother admitted that she had relapsed on methamphetamines, that the caseworker believed she observed Mother under the influence of drugs during her participation in the START program, and that Mother's "ongoing drug usage while she was the sole caregiver of the minor children warrants the State, in the interests of the children in assuming their guardianship." The magistrate also

found that Mother would often walk out of treatment meetings, that Y.R. and A.B. were noted to have high levels of anxiety, and that A.B. suffered nightmares and craved THC. However, the magistrate dismissed the agency's allegation of dependency under R.C. 2151.04(B), which concerns children who lack "adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian[,]" because the magistrate found that "no evidence was presented that would indicate the children did not have adequate care."

{¶13} The magistrate noted that all previous orders of the juvenile court would continue "in full force and effect," including required drug and alcohol evaluation, random drug screens, mental health evaluation, relative home investigation, and supervised parenting time.

{¶14} On the same day, the juvenile court adopted the magistrate's decision.

### 4. Case Plan for Reunification

{¶15} On June 2, 2020, WCCS filed Mother's case plan for reunification. The case plan required Mother to (1) become and remain sober 100% of the time, (2) maintain safe, stable housing, (3) demonstrate a clean and sober lifestyle 100% of the time, (4) demonstrate mental health stability, (5) be cooperative with and make herself available to the agency, (6) submit to random drug screens, (7) submit to drug and mental health assessments and follow recommendations, (8) not be involved in any criminal activity, and (9) allow WCCS caregivers to have ongoing access to the residence so that progress and safety could be assessed. The case plan also required that Y.R. and A.B. attend medical and counseling sessions as needed.

### 5. Dispositional Hearing

{¶16} The next day, June 3, 2020, the parties appeared for a dispositional hearing before the same magistrate who had presided over the adjudicatory hearing. Mother and

- 5 -

WCCS caseworker, Melinda Callahan, testified.

{¶17} Though we will postpone a more detailed summary of Mother's and Callahan's disposition hearing testimony until our discussion of Mother's third assignment of error, we note now that Mother testified that she had been sober since Y.R.'s removal. Callahan agreed that Mother had not tested positive in random drugs screens conducted after removal but noted that Mother had failed to appear for a required random drug test on one occasion. And under WCCS's policy, Mother's failure to appear for her drug screen within 24 hours was considered a positive result. Callahan also reported that Mother was alleged to have tampered with a drug test on one occasion. Callahan further noted that the agency had not been able to verify Mother's progress with any of her treatment providers because Mother had only signed limited releases of information. WCCS recommended that the court continue temporary custody with the agency and continue to monitor Mother's progress. The court took the matter under advisement, pending an in camera interview with Y.R.

**6. Dispositional Decision, Mother's Objections, and Decision on Objections**

{¶18} On June 9, 2020, Mother filed a pro se motion to dismiss. In her motion, Mother raised numerous arguments, including that WCCS violated her due process rights by failing to notify her of the shelter care hearing, that WCCS failed to make reasonable efforts to prevent Y.R.'s removal, that Y.R. was well taken care of by Mother and there was no reason to remove her, that WCCS failed to timely file the case plan and failed to timely hold the adjudicatory hearing, and that it was in Y.R.'s best interest that she be returned to Mother's custody.

{¶19} The juvenile court conducted in camera interviews of Y.R. and A.B. On June 18, 2020, the magistrate issued a decision on disposition, finding that it was in Y.R.'s best interest to remain in WCCS's temporary custody.

{¶20} The same day, the magistrate issued a separate order acknowledging

Mother's June 9 motion to dismiss and indicating that the magistrate would consider the motion to dismiss to be Mother's "Objection to the Magistrate's Decision," and stating that "the Court will consider said Objection to be timely filed on June 17, 2020." The order did not clarify whether the magistrate considered Mother's motion to dismiss as an objection to the magistrate's May 27, 2020 adjudicatory decision, or as an objection to the June 18, 2020 dispositional decision.

{¶21} Mother filed several additional pro se motions in July 2020 essentially reiterating many of her earlier arguments concerning the dependency case. On July 15, 2020, Mother's counsel filed an objection to the magistrate's June 18 dispositional decision.

{¶22} On September 2, 2020, the juvenile court issued a decision in which it addressed the arguments raised in (1) Mother's June 9 motion to dismiss, which the juvenile court construed as Mother's objections to the magistrate's June 18 dispositional decision, and (2) the "second objection" filed by Mother's counsel on July 15, 2020. With regard to due process, the court found that the evidence indicated that Mother had been notified that the agency was filing a complaint. But even if she had not, Mother had exercised her right under Juv.R. 7 to a rehearing and had received a rehearing of the original emergency shelter care hearing. Concerning reasonable efforts, the court found that WCCS had made reasonable efforts to prevent Y.R.'s removal by engaging with Mother in the START program for two months while attempting to keep the family intact. With respect to the timeliness of the case plan, the court found that although the plan was untimely filed, Mother had failed to establish any prejudicial effect from the late filing. The court noted that Mother was aware of the services she needed to complete and had begun engaging in those services prior to the dispositional hearing. The court found that the late filing did not affect Mother's compliance or noncompliance with the agency's case plan.

{¶23} With regard to Mother's arguments related to the dependency finding and the

timing of the adjudicatory hearing, the court noted that a decision on adjudication is a final appealable order and any objection to the decision on adjudication was due by June 4, 2020. The court noted that Mother filed her motion to dismiss/objection on June 9, 2020, thus rendering it untimely. Accordingly, the court indicated it would not address Mother's arguments concerning the adjudication.

{¶24} Finally, the juvenile court rejected Mother's argument that it was in Y.R.'s best interest to be returned to Mother's care. The court noted that the evidence indicated that Mother was a recovering drug addict whose last drug use had occurred only two and one half months prior to disposition. The court further noted that WCCS had been unable to communicate with Mother's treatment providers or verify her progress in treatment. The juvenile court found that Mother's drug abuse and mental health were the agency's primary concerns, and those concerns had not been alleviated by the time of the dispositional hearing. Accordingly, the court found that Y.R.'s best interests were served by granting temporary custody to the agency.

**B. Analysis of Assignments of Error**

{¶25} Mother appeals, raising four assignments of error. We will address these assignments of error out of order.

{¶26} Assignment of Error No. 1:

{¶27} THE TRIAL COURT ERRED BY RULING THAT MOTHER'S OBJECTION TO THE ADJUDICATION WAS NOT TIMELY FILED AND BY NOT ADDRESSING THE OBJECTION.

{¶28} As discussed above, the magistrate construed Mother's June 9, 2020 motion to dismiss as her "Objection to Magistrate's Decision" without specifying which decision – the adjudicatory decision or the dispositional decision – the court considered the subject of Mother's objection. The juvenile court, on the other hand, stated that the magistrate had

construed Mother's motion to dismiss as "an objection to the Magistrate's Decision of June 18, 2020" – that is, the dispositional decision, even though the motion to dismiss was filed *before* the dispositional decision was issued. But the juvenile court seems not to have adhered strictly to this characterization, as the juvenile court later found that, with respect to "any objection Mother raised to the adjudication decision in both the June 9, 2020 and July 20, 2020 objections," those objections were untimely because objections to the adjudicatory decision were due by June 4 pursuant to the 14-day deadline for objections set forth in Civ.R. 53(D)(3)(b)(i) and Juv.R. 40(D)(3)(b)(i). Mother's appellate brief assumes that the juvenile court treated her motion to dismiss "as an objection to the adjudication decision," ignoring the juvenile court's treatment of the motion to dismiss as, apparently, objections to both the adjudicatory and dispositional decisions. Mother contends that the juvenile court erred because her objection to the adjudication decision was timely based upon the tolling period in the Ohio Supreme Court's COVID-19 emergency tolling order.[1]

{¶29} If we assume that Mother's June 9 motion to dismiss was indeed her objection to the adjudicatory hearing, Mother is correct that the court erred in finding the objections untimely, but it is unnecessary to look to the tolling order to reach that conclusion. The magistrate issued the adjudicatory decision on May 27. Accordingly, under Civ.R. 53 and Juv.R. 40, Mother had fourteen days from May 27 to file objections. Her time to file objections thus would have expired June 10, not June 4, the date calculated by the court. In calculating the 14-day deadline for filing of objections, it appears that the juvenile court may have mistakenly started the count on the day of the adjudication hearing, held May 21, rather than the May 27 decision date. So Mother timely filed her June 9 motion to dismiss – considered objections by the juvenile court – one day before the June 10 deadline.

---

1. 3/27/2020 Administrative Action, 2020-Ohio-1166.

{¶30} But even though Mother's objections were timely, if indeed they were objections to the adjudicatory decision, and the court's finding that they were untimely was error, we find that any error was harmless for the following reasons. Mother argues that the juvenile court failed to address the June 9 objection, but that is not correct. The juvenile court did address all of Mother's June 9 arguments in its September 2, 2020 decision, with the sole exception of Mother's argument that the adjudicatory hearing was untimely. We have already explained above how the trial court resolved Mother's other June 9 arguments, and we need not repeat that summary here. Mother's assertion that the trial court failed to consider those arguments is incorrect.

{¶31} With regard to Mother's June 9 objection that the adjudicatory hearing was held on an untimely basis, we have determined below, in our discussion of Mother's fourth assignment of error, that this argument is without merit. Therefore, even if the juvenile court should have considered Mother's objection to the timeliness of the adjudicatory hearing, Mother was not prejudiced by its failure to do so.

{¶32} We overrule Mother's first assignment of error.

{¶33} Assignment of Error No. 4:

{¶34} THE TRIAL COURT ERRED IN RULING THAT MOTHER WAS NOT PREJUDICED BY THE COURT NOT HOLDING AN ADJUDICATION HEARING WITHIN 30 DAYS OF THE FILING OF THE COMPLAINT AND BY THE AGENCY NOT FILING THE CASE PLAN WITHIN THE STATUTORY TIME FRAME.

{¶35} Mother's fourth assignment of error concerns two procedural deficiencies. First, Mother argues that she was prejudiced by the juvenile court not holding the adjudicatory hearing within 30 days after the filing of the complaint, and instead holding it 71 days after the filing of the complaint. Indeed, Juv.R. 29 provides that, "[i]f the complaint alleges abuse, neglect, or dependency, the hearing shall be held no later than thirty days

- 10 -

after the complaint is filed[,]" and the adjudicatory hearing in this case was held more than 30 days after the complaint was filed. However, Juv.R. 29 makes clear that the 30-day deadline is not absolute, as it goes on to state:

> For good cause shown, the adjudicatory hearing may extend beyond thirty days either for an additional ten days to allow any party to obtain counsel or for a reasonable time beyond thirty days to obtain service on all parties or complete any necessary evaluations. However, the adjudicatory hearing shall be held no later than sixty days after the complaint is filed.

{¶36} Mother did not raise any objection to the timing of the adjudicatory hearing before the hearing or at the start of the hearing. Mother's failure to object constitutes waiver. We are limited to reviewing for plain error. "Plain error in the civil context is 'extremely rare' and this court must find that the error involves 'exceptional circumstances' where the error 'rises to the level of challenging the legitimacy of the underlying judicial process itself.'" *In re J.W.*, 12th Dist. Butler Nos. CA2017-12-183 and CA2017-12-184, 2018-Ohio-1781, ¶ 13, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122 (1997). "The doctrine implicates errors that are 'obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings.'" *In re J.M.*, 12th Dist. Butler Nos. CA2018-06-124 and CA2018-06-125, 2019-Ohio-3716, ¶ 14, quoting *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982).

{¶37} Mother cannot establish plain error because she was not prejudiced by the timing of the adjudicatory hearing. While the adjudicatory hearing was held 31 days after the 30 day deadline and 11 days after the last-chance 60-day deadline, the rule specifically provides that:

> The failure of the court to hold an adjudicatory hearing within any time period set forth in this rule does not affect the ability of the court to issue any order otherwise provided for in statute or rule and does not provide any basis for contesting the

jurisdiction of the court or the validity of any order of the court.

Mother cannot establish prejudice when Juv.R. 29 states that the failure of the juvenile court to hold the adjudicatory hearing in compliance with the rule did not affect the ability of the juvenile court to issue other orders, including the adjudicatory order. *In re Cass*, 12th Dist. Preble No. CA95-03-002, 1995 WL 631650, *5 (Oct. 30, 1995) ("A juvenile court's failure to abide by the time limitations set forth in Juv.R. 29[A] does not affect the court's jurisdiction to render an adjudication of dependency * * *.").[2]

{¶38} Second, Mother argues that she was prejudiced by WCCS's failure to timely file its case plan for reunification. Mother points to R.C. 2151.412, which governs case plans involving children that are alleged to have been abused, neglected, or dependent. The statute provides that the agency "shall file the case plan with the court prior to the child's adjudicatory hearing but no later than thirty days after the earlier of the date on which the complaint in the case was filed or the child was first placed into shelter care." R.C. 2151.412(D). The statute states that the agency "shall" file the case plan in the time period just described, and it is self-evident that shall means must. *Wilson v. Lawrence*, 150 Ohio St.3d 368, 2017-Ohio-1410, ¶ 13; *see Lovejoy v. Diel*, 12th Dist. Butler No. CA2020-06-067, 2021-Ohio-1124, ¶ 31. Here, the agency filed the case plan on June 2, 2020, one day prior to the dispositional hearing and 83 days after the complaint was filed. Thus, Mother is correct that the case plan was not timely filed under R.C. 2151.412(D).

{¶39} Mother argues that this untimely filing prejudiced her, and as a result the agency's complaint should be dismissed, but she cites no statutory authority authorizing dismissal of an agency's complaint because a case plan was untimely filed. This is to be

---

2. We further note that the agency's complaint was filed essentially contemporaneously with the statewide emergency lockdown due to COVID-19. It is not evident from the record to what extent the pandemic affected the administration of the juvenile court and the timing of the adjudicatory hearing, but some delay should be reasonably expected given this unprecedented event.

expected, as neither R.C. 2151.412 nor any other provision in Chapter 2151 explain what consequences, if any, may or must follow when a case plan is untimely filed. Though Mother also cites no case law supporting her request for dismissal, her argument that prejudice caused by the late filing of a case plan requires dismissal is arguably supported by some precedent of our sister districts. For example, when reviewing an appellant's argument that the late filing of a case plan should result in dismissal of a children's services agency's complaint, the Tenth District Court of Appeals noted that "appellant must demonstrate some sort of prejudicial effect" resulting from the late filing of the case plan, before it found none. *In re Malone*, 10th Dist. Franklin, No. 03AP-489, 2003-Ohio-7156, ¶ 44. Likewise, the Eighth District found that an appellant failed to object to the late filing of a case plan and could not establish plain error because he could not show that he was prejudiced by the untimely filing, saying that "even if we decided that appellant had not waived this error, we nevertheless would find that he has failed to establish any prejudicial effect as a result of the late filing of the case plan." *In re J.J.*, 8th Dist. Cuyahoga, No. 86276, 2007-Ohio-535, ¶ 33.

{¶40} Even if Mother is correct that prejudice resulting from the late filing of the case plan could require dismissal of the agency's complaint, based upon the record before us, we do not find that Mother suffered any prejudice. As discussed at length during the dispositional hearing, the agency's case plan had effectively the same requirements as were set forth in the court's emergency shelter care order. The court's order directed Mother to complete drug, alcohol, and mental health evaluations, submit to random drug tests, and "execute requisite release[s] of information." As discussed below with respect to Mother's third assignment of error, Mother failed to comply with the order's requirement that she sign necessary releases of information regarding her substance abuse and mental health treatment, and her failure to do so prevented the agency from determining whether she was

addressing the concerns that led to Y.R.'s removal.

{¶41} The juvenile court specifically noted that "mother was aware of the services needing to be completed and began engaging in said services prior to the dispositional hearing." Additionally, the magistrate and the juvenile court both determined that Y.R. should remain in WCCS's temporary custody based on the determination that this was in Y.R.'s best interests. The magistrate's disposition decision and the juvenile judge's decision adopting that decision described Mother's failures with respect to the court's orders, but did not state that temporary custody was extended due to any failure to comply with the case plan. On the contrary, the magistrate's disposition order referenced Callahan's recommendation that Mother be given additional time to "[complete] case plan services."

{¶42} As we have determined, Mother was not prejudiced by the late filing of the case plan and we note she does not argue that the complaint may be dismissed in the absence of prejudice. We overrule Mother's fourth assignment of error.

{¶43} Assignment of Error No. 2:

{¶44} THE TRIAL COURT ERRED IN ADJUDICATING Y.R. DEPENDENT.

{¶45} In her second assignment of error, Mother argues that the juvenile court's decision finding Y.R. dependent was against the manifest weight of the evidence. She contends that the greater weight of evidence demonstrated that she was providing proper care and support to Y.R. Mother further argues her drug and mental health concerns lacked any nexus to concerns with Y.R.'s care and well-being. Mother contends that because there was no evidence that her substance abuse was negatively affecting Y.R., the juvenile court must have improperly inferred that Y.R. had been harmed.

{¶46} The juvenile court adjudicated Y.R. to be a "dependent child" under R.C. 2151.04(C). That statute provides that a "dependent child" is any child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the

child's guardianship * * *." The determination that a child is dependent requires no showing of fault on the parent's part. *In re S.W.*, 12th Dist. Brown No. CA2011-12-028, 2012-Ohio-3199, ¶ 12. Rather, the focus is on the child's condition or environment and whether the child was without adequate care or support. *In re W.C.H.*, 12th Dist. Butler No. CA2014-02-057, 2015-Ohio-54, ¶ 14. However, a court may consider a parent's conduct insofar as it forms part of the child's environment. *In re S.J.J.*, 12th Dist. Butler No. CA2006-02-021, 2006-Ohio-6354, ¶ 12. "A parent's conduct is significant if it has an adverse impact on the child sufficient to warrant intervention." *In re S.W.* at ¶ 12.

{¶47} A trial court's determination that a child is dependent must be supported by clear and convincing evidence. R.C. 2151.35(A). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). This court's review of a juvenile court's decision adjudicating a child dependent is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re L.S.*, 12th Dist. Warren Nos. CA2017-11-157 and CA2017-11-160, 2018-Ohio-1981, ¶ 25; *In re Day*, 12th Dist. Clermont No. CA2002-09-073, 2003-Ohio-3544, ¶ 20. Even if a trial court's judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence. *In re L.S.* at ¶ 25; *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 9.

{¶48} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *In re V.N.*, 12th Dist. Butler Nos. CA2016-12-229, CA2016-12-230, CA2016-12-235, and CA2016-12-236, 2017-Ohio-2586, ¶ 22. When considering a manifest weight of the evidence challenge, the reviewing court weighs the evidence and all

reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts, the trial court clearly "lost its way" and created such a "manifest miscarriage of justice" that the judgment must be reversed and a new trial ordered. *In re S.M.* at ¶ 10.

{¶49} In weighing the evidence, a reviewing court must be mindful of the presumption in favor of the finder of fact. *Id.* In determining whether the trial court's decision is manifestly against the weight of the evidence, "'every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.'" *Id.*, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21. "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* A reversal on manifest weight grounds should only be granted under exceptional circumstances, when the evidence weighs heavily against the judgment. *In re P.G.*, 12th Dist. Warren Nos. CA2015-01-009 and CA2015-01-010, 2016-Ohio-1433, ¶ 44.

{¶50} The only witness who testified at the adjudicatory hearing, Laney Foster, testified that she was the WCCS caseworker assigned to the agency's START program, which is a reunification program that offers in home support services to families struggling with substance abuse issues. The START program requires the participating parent to meet with WCCS staff and mentors weekly, and to submit to random drug screens.

{¶51} WCCS began working with Mother in January 2020, after Mother had a mental health episode during a traffic stop and subsequently disclosed to hospital staff that she was struggling. Mother was open with Foster about her issues. She had a significant history of drug abuse. Mother admitted to Foster that she had relapsed on methamphetamine in December 2019 but was getting services through the Talbert House.

As part of the START program, Foster screened Mother for drugs on a weekly basis. Mother was compliant with submitting to drug screens, but Mother tested positive for methamphetamines every week but two. In this regard, Foster stated that Mother had therapy sessions that were very distressing to her, they would take place on a Friday, and the sessions would "trigger" her to relapse over the weekend.

{¶52} Based on Mother's inability to maintain sobriety, Mother's Talbert House counselor had recommended that Mother receive inpatient treatment. So that Mother could attempt inpatient treatment, the agency tried to place Y.R. However, no one was available at the time to take the placement. Consequently, Mother could not attempt inpatient treatment.

{¶53} Mother had mental health issues based on an assessment conducted at the Talbert House. That assessment had diagnosed Mother with bipolar disorder, post-traumatic stress disorder, anxiety, depression, and borderline personality disorder. Mother was prescribed medications to treat these conditions, but she refused to take all of the medications except one, Wellbutrin, which was a mood booster that would not stabilize her mental health. Foster further testified that the day before the hearing she was informed by the Talbert House that Mother had walked out of a counseling session and was refusing to continue services. Mother's counselor informed Foster that Mother's mental health was "extremely unstable" and that outpatient treatment was insufficient and Mother needed inpatient mental health services.

{¶54} Foster testified that the agency had no concerns with Mother's home. It was clean and there were no safety hazards, and Mother met Y.R. and A.B.'s basic food and shelter needs. However, the agency concluded that Y.R. and A.B. were at risk because of Mother's noncompliance with substance abuse treatment and mental health treatment. Foster viewed Mother as extremely unstable, and concluded that Y.R. and A.B. "feed off of

[Mother's] energy." In describing the instability within the home, Foster explained when different caseworkers would visit the home in the morning and afternoon, "it is a rollercoaster of what you're gonna expect," with Mother behaving in radically different ways throughout the day. Both Y.R. and A.B. had their own mental health issues. Y.R., who had high anxiety, had self-harmed as recently as the end of January, and Foster attributed this to "the anxiety of the home, and [Mother's] mental health." Additionally, a week before the adjudicatory hearing, Y.R. punched another student at school. A.B. had recently admitted to WCCS that she was using illegal drugs, and that she was fearful that she would become an addict, and that she was requesting to go to Narcotics Anonymous meetings with Mother. Both children were in counseling.

{¶55} Foster testified that WCCS decided to file the dependency complaint based on a number of factors. Mother continued to abuse methamphetamine while Y.R. and A.B. were in her care. Mother's counselor at Talbert House had reported that she could not work with Mother anymore. Mother had left appointments at the Talbert House due to her becoming upset. Mother had walked out of an intensive outpatient session, and treatment thus far had been ineffective. Mother had a combative attitude toward her caseworker and had threatened her. Mother refused to follow through with mental health recommendations. Mother had recently stated that she was going to leave the state with Y.R. and A.B. and return to California in order to get away from her problems in Ohio.

{¶56} Foster testified that she contacted Mother to inform her that the agency was preparing to file a complaint and to give her the time and address for the shelter care hearing. Mother became very upset and threatened that that she would kill herself. Mother also threatened to kill Foster. Then Mother went to Y.R.'s school and attempted to remove Y.R. before dismissal. Mother had to be physically restrained from entering the school by the school resource officer.

{¶57} Mother was present at the adjudicatory hearing but presented no testimony, at all, let alone any testimony contradicting Foster's testimony.[3]

{¶58} Upon review, we conclude that WCCS presented sufficient credible evidence at the adjudicatory hearing to support the juvenile court's finding that Y.R. was a dependent child. Mother's ongoing abuse of methamphetamine and unwillingness to appropriately address her mental health issues, while acting as the sole provider and caregiver for Y.R., merited the state's assumption of custody. According to Foster, Mother's therapy sessions were "triggering" her to abuse drugs. And Foster testified that Mother's erratic behavior affected Y.R. and A.B., both of whom had recently engaged in self-harm and other troubling behavior. Given such testimony, the trial court did not "lose its way" in concluding that Y.R.'s "condition or environment [was] such as to warrant the state, in the interests of the child, in assuming the child's guardianship." R.C. 2151.04(C).

{¶59} Mother contends that there was no evidence that Y.R. was harmed as a result of her substance abuse and points out that the evidence showed that Y.R. was doing well in school and the agency had no concerns with the home. However, simply because a child's physical needs are being met and a home is clean does not preclude a juvenile court from finding a child dependent. *In re L.H.*, 12th Dist. Warren Nos. CA2018-09-106, and

---

3. The magistrate who heard testimony at the emergency care shelter hearing and the rehearing was not the same magistrate who heard testimony at the adjudicatory hearing. The record does not indicate whether the magistrate who heard testimony at the adjudicatory hearing considered Mother's testimony from the rehearing. We note that Mother did testify at the rehearing of the emergency shelter care hearing, and at that time she testified, among other things, that she had requested WCCS's assistance in January 2020 because she was unable to obtain the services her children needed, that she disagreed with her bipolar disorder diagnosis and refused to take all prescribed medications except Wellbutrin, that she walked out of a Talbert House counseling session because she was unhappy about being asked about taking her medications. Mother also testified at the rehearing that both Y.R. and A.B. had mental health issues, that Y.R. had a "psychotic breakdown" and tried cutting herself, and she admitted that she used methamphetamines immediately before she was arrested for threatening Foster. She admitted to struggling with PTSD, anxiety, and depression, but blamed her non-engagement in mental health services on Talbert House not calling her. Mother insisted that she was a good mother and that her children were not in any danger. Therefore, much of Mother's testimony at the rehearing actually supported most of Foster's testimony at the adjudicatory hearing on the key factual issues.

CA2018-09-109 thru 111, 2019-Ohio-2383, ¶ 47 (affirming dependency finding where agency had no concerns with the condition and cleanliness of the home, but children had been exposed to marijuana use in the home).

{¶60} The state does not need to demonstrate actual harm to a child before taking steps to ensure that a child is protected; it is sufficient that "circumstances giving rise to a legitimate risk of harm may suffice to support an adjudication of dependency under R.C. 2151.04(C)." *In re N.J.*, 12th Dist. Warren Nos. CA2016-10-086, CA2016-10-090 and CA2016-10-091, 2017-Ohio-7466, ¶ 20; *see In re K.A.*, 5th Dist. Fairfield Nos. 2008CA00067 thru 70, 2009-Ohio-2499 (affirming dependency finding where issues involved drug use and failure to comply with treatment despite a suitable home); *In re J.C.*, 9th Dist. Summit Nos. 26229 and 26233, 2012-Ohio-3144, ¶ 21 (holding that a parent's mental health has a direct impact on a child's environment).

{¶61} Mother cites *In re Burrell*, 58 Ohio St.2d 37 (1979), and *In re R.S.*, 9th Dist. Summit No. 21177, 2003-Ohio-1594, for the proposition that a court may not infer harm and that drug abuse alone is not a sufficient basis for a finding of dependency. But in *Burrell*, the only evidence presented of alleged detrimental impact to allegedly dependent children was that their mother was living with her boyfriend in the children's presence. *Id.* at 37. That is certainly not an analogous situation to this case. *R.S.* involved a mother who used marijuana outside of the presence of the children, but the children services agency had no evidence that the marijuana use had negatively affected any of the children. *Id.* at ¶ 18. This case is quite different, as Mother's methamphetamine use and ongoing mental health struggles gave rise to a legitimate risk of harm to Y.R., who was struggling with mental health issues, had recently engaged in self-harm, and had recently struck a girl at school, and supports the juvenile court's dependency finding. Foster offered testimony – unrebutted by Mother – that Mother's instability fed Y.R.'s mental health issues and was

tied to her self-harm. Given the testimony presented, the trial court did not "lose its way" in adjudicating Y.R. dependent. The juvenile court was not required to experiment with Y.R.'s health and safety. We overrule Mother's second assignment of error.

{¶62} Assignment of Error No. 3:

{¶63} THE TRIAL COURT ERRED AT DISPOSITION IN PLACING Y.R. OUTSIDE OF MOTHER'S CUSTODY AND CARE.

{¶64} Mother argues that the juvenile court abused its discretion when it issued a dispositional order continuing temporary custody of Y.R. with WCCS. Mother argues that, when considering all the evidence admitted at the dispositional hearing, it was in Y.R.'s best interest that she be returned to Mother's care.

{¶65} We review a juvenile court's dispositional order with respect to a dependent child for an abuse of discretion. *In re Day*, 2003-Ohio-3544, at ¶ 22. The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶66} R.C. 2151.353 provides five dispositional alternatives from which a court may choose in making an appropriate order for a child who is dependent. These dispositional alternatives are listed in paragraphs (A)(1) through (5) from the least restrictive alternative to the most restrictive disposition. The juvenile court's dispositional order placed Y.R. in temporary custody pursuant to section (A)(2), the second least-restrictive option available under the statute. The only less restrictive alternative to this disposition is protective supervision, as provided in section (A)(1). Thus, Mother effectively argues that the court should have returned Y.R. to her care under protective supervision.

{¶67} A juvenile court must consider the best interests of the child when it considers the dispositional alternatives enumerated in R.C. 2151.353(A). *In re Cunningham*, 59 Ohio St.2d 100, 107 (1979). In order to determine the best interest of a child, R.C. 3109.04(F)(1)

requires the juvenile court to consider all relevant factors. *In re M.M.*, 12th Dist. Fayette No. CA2010-12-034, 2011-Ohio-3913, ¶ 9. These factors include, but are not limited to:

> the wishes of the parents; the child's wishes and concerns, if interviewed; the child's interaction and interrelationship with other family members or others who may significantly affect the child's best interest; the child's adjustment to home, school and community; the mental and physical health of all persons involved; the likelihood that the caregiver would honor and facilitate or had honored and facilitated visitation and parenting time; whether support orders have been followed; whether household members or parents have been convicted or pled guilty to certain offenses; and whether a parent intends to establish an out of state residence.

*In re A.L.H.*, 12th Dist. Preble No. CA2010-02-004, 2010-Ohio-5425, ¶ 9 (citing R.C. 3109.04(F)(1)).

{¶68} Mother and Callahan testified at the disposition hearing.[4] Mother, who was 33 years old at the time of the disposition hearing, testified that she first became addicted to methamphetamine at the age of 18. Mother claimed that the last time she used methamphetamine was March 10, 2020, the day prior to Y.R.'s removal. Mother admitted that she failed to attend her required random drug screen on April 21, 2020, but testified that she had not appeared because she was "out of town," by which she meant that she was at her boyfriend's house in Dayton, Ohio. She claimed that she drove to Dayton but could not drive back to Lebanon for the drug test within the permitted 24-hour window because she was out of gas. During an explanation of how her financial situation impacted her ability to travel, Mother stated that on occasion she had borrowed money from "my 19 year old" to buy gas. Mother denied tampering with a recent drug screen, but testified that she might test positive for amphetamines, claiming that Wellbutrin could cause a false positive.

---

4. A.B.'s father, also testified, but we need not consider his testimony with regard to Mother's third assignment of error.

{¶69} Mother claimed that, in compliance with the court's shelter care order, she had sought and was receiving counseling from Solutions Community Counseling and Recovery Centers. She testified that someone at Solutions told her she was "doing an absolutely wonderful job" and all that she could do to get better. She was also engaged with Right to Recovery, which had performed a drug and alcohol assessment and recommended a five-week course, intensive outpatient services, therapy, and psychiatric services. Mother admitted that her drug and alcohol treatment was ongoing, but denied that she had not successfully completed those treatments.

{¶70} Mother admitted that she had only authorized her service providers to release attendance records to WCCS, not her treatment records. She did not believe that WCCS was entitled to her treatment records because it was "not up to [WCCS] to look at my treatment records and what I'm doing. All they need to know really * * * is that I'm complying with these orders."

{¶71} Mother admitted that she was still not taking most of her recommended medications, explaining that she could regulate her emotions by herself and that she was better when she was not on her medications. She stated that she was her own "holistic type of coach."

{¶72} WCCS caseworker Melinda Callahan testified that she was assigned as Mother's caseworker after the complaint was filed. Callahan prepared the case plan for reunification that was filed the day before the dispositional hearing, and that replaced the START program case plan which had previously guided WCCS's interactions with Mother.

{¶73} Callahan referred to the requirement that Mother sign releases of information for all of her treatment providers and testified that while she was able to confirm Mother's attendance at mental health treatment, she was unable to confirm Mother's attendance at substance abuse treatment because Mother had not executed the necessary records

releases.

{¶74} Callahan had no knowledge of Mother's level of engagement with Solutions. WCCS had not referred Mother to Solutions, and to Callahan's knowledge Solutions was never provided with background information about Mother's mental health and substance abuse history. Callahan had attempted to contact Solutions, but the provider would only relay information about Mother's past attendance and told Callahan that Mother had informed Solutions that it was not permitted to tell Callahan if Mother was attending or not. Callahan asked Mother to sign a release of information form for Solutions and Mother refused. Callahan testified that as of the day of the hearing she could not summarize where Mother stood with regard to drug and alcohol or mental health treatment, but that it was fair to say that those services had not been completed. Callahan stated that she would need documentation or communication from Mother's providers in order to confirm Mother's status. Callahan also had no knowledge, until hearing Mother's testimony, that Mother was engaged in services at Right to Recovery.

{¶75} Callahan testified that Mother had mostly been compliant with recent drug screens, with the exception of Mother's single failure to appear, which was considered a positive result by WCCS. She also had some concerns that Mother may have tampered with a drug screen based on an employee observing Mother engaging in behavior that could indicate tampering on one occasion.

{¶76} Callahan had concerns with inappropriate subjects Mother would discuss during telephone calls with Y.R. Despite repeated admonishments by the caseworker not to talk to Y.R. concerning the dependency case, Mother would talk about the case. She also would discuss her plans to sue the agency federally. Mother promised Y.R. that Y.R. would be coming home immediately after the dispositional hearing.

{¶77} Callahan testified that Mother's home was appropriate. And Y.R. told

Callahan that she wanted to be returned to Mother's custody. However, Y.R. also had said she was okay with remaining with her foster family until she could be returned to Mother's care.

{¶78} Callahan testified that Y.R. and A.B. had adjusted well to their foster placement. They were helping around the house, were engaged in therapy, and finished the academic year at school. Overall "things have gotten a lot better."

{¶79} Callahan stated that Mother had made some progress, but not significant progress. If Mother really had made significant progress, as Mother claimed, Callahan could not confirm it because she was unable to communicate with Mother's providers. The agency recommended that Y.R. remain in her current foster placement so that the agency could continue to attempt to monitor Mother's progress on her case plan.

{¶80} Upon review, we do not find that the juvenile court abused its discretion in determining that it was in Y.R.'s best interest to remain in the temporary custody of the agency. Prior to Y.R.'s removal, Mother demonstrated a lack of ability to adhere to treatment and maintain her sobriety. Mother claimed that, after removal, she was sober and progressing in treatment. However, by the time of the dispositional hearing, WCCS had not been able to confirm Mother's claims. This was not an agency failure, but rather because Mother, for reasons unknown, decided to authorize only a limited release of information to the agency. Mother's decision was contrary to the juvenile court's order, which required that Mother "execute requisite release[s] of information."

{¶81} The evidence at disposition further supported the agency's other concerns with returning Y.R. to Mother's care. These concerns included suspicions regarding Mother's sobriety based on her failure to appear for a required drug test and potential tampering with another drug test, Mother's continued mental health concerns (for which she was refusing medications), her erratic and antagonistic relationship with the agency and its

caseworkers, and her refusal to abide by the caseworker's admonishments concerning appropriate subject to discuss with Y.R. Notably, all of these concerns exist independent of the late-filed case plan.

{¶82} Given these legitimate concerns, and given testimony that Y.R. had adjusted well in foster care and was obtaining the treatment she needed, the juvenile court did not abuse its discretion in continuing temporary custody with the agency based on its analysis of the best interest factors. Significantly, the juvenile court's decision was only an extension of temporary custody, not an award of permanent custody. If Mother is in fact progressing on her treatment and working towards reunification, she could regain custody of Y.R.

{¶83} Mother's argument that Y.R. should have been placed in protective custody, not temporary custody, is based on her testimony that she had not used drugs since before Y.R.'s removal and that she was complying with the court's orders. But because the agency could not confirm Mother's testimony due to Mother's own decision not to provide the required releases, it was not an abuse of discretion for the trial court to choose temporary custody, rather than protective supervision. We overrule Mother's third assignment of error.

{¶84} Judgment affirmed.

PIPER, P.J., and S. POWELL, J., concur.