[Cite as *In re N.B.*, 2025-Ohio-528.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: N.B.

C.A. No.     31148

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 23 12 1006

DECISION AND JOURNAL ENTRY

Dated: February 19, 2025

CARR, Judge.

{¶1}    Appellant, A.W. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that adjudicated her minor child dependent and placed the child in the temporary custody of Summit County Children Services Board ("CSB").  This Court affirms.

I.

{¶2}    Mother is the biological mother of N.B., born December 1, 2023.  The child's father ("Father") was involved in the proceedings below but did not appeal from the trial court's judgment.

{¶3}    Mother has a history with CSB involving her inability to care for her older children because of her substance abuse problems.  CSB removed Mother's two older children from her custody in prior juvenile court cases, but few details about those cases are set forth in the record, except that the trial court placed those children in the legal custody of their maternal grandmother

several years ago. To address her long-term opioid addiction, Mother began a medically assisted drug treatment program approximately four years before N.B. was born, which included her taking daily doses of methadone to prevent her relapsing to heroin or fentanyl use.

{¶4} After her admission to Summa Akron City Hospital for the birth of N.B., Mother tested positive for methadone and methamphetamine. She later admitted to hospital personnel that she had been taking methamphetamine illegally to treat symptoms of attention deficit hyperactivity disorder. She further admitted that she continued to use methamphetamine on a regular basis.

{¶5} After N.B.'s birth, the Summa medical team called for assistance by a team from Akron Children's Hospital neonatal intensive care unit ("NICU") because the child was in respiratory distress. N.B. was transferred to the NICU because of "Slow Transition to Extrauterine Life and Drug Exposure[,]" and remained in the NICU for one day. After N.B. returned to the Summa nursery, according to medical doctors who diagnosed the child, her active problems included "[n]ewborn affected by maternal use of drug of addiction" and the child's treatment plan required at least five days of monitoring and treatment of symptoms of drug withdrawal. The hospital staff did not determine which drug caused the child's withdrawal symptoms.

{¶6} Regardless of the specific drug that caused the child's withdrawal symptoms, N.B. remained in the hospital for five days, while medical staff continually monitored her using the Eat, Sleep, Console scoring system (ESC). Using this assessment and treatment method, hospital staff regularly monitored N.B.'s ability to consume food, sleep, and be consoled and adjusted her treatment until hospital staff determined that the child was prepared to leave the hospital. Initially, according to the hospital records, the child's ESC scores demonstrated specific symptoms of Neonatal Abstinence Syndrome ("NAS") because she was not eating well and continued to lose weight; was sleeping less than one hour at a time; and was unable to be consoled in 10 minutes.

N.B.'s ESC notes indicate that she made progress toward discharge throughout her hospital stay. On December 6, 2023, at 5:44 p.m., the child's chart notes that her symptoms had subsided to the level that she was deemed "Adequate for Discharge[.]"

{¶7} During N.B.'s hospital stay, hospital staff repeatedly spoke with the parents about the child's NAS diagnosis, including her specific symptoms of drug withdrawal, which included unusual fussiness, excessive sucking, diarrhea, and greater weight loss than normal. Several hospital nurses explained to Father and Mother that N.B. could not be released from the hospital until she had completed at least five days of ESC monitoring and was cleared by medical staff for release. The parents did not accept that explanation for the child's symptoms and refused to work with hospital staff to learn how to address the child's special medical needs.

{¶8} Father was particularly uncooperative with hospital personnel and continued to insist that N.B. was not experiencing drug withdrawal. Instead, he believed that the child's symptoms had been caused by the infant formula that the hospital was feeding her. He brought in powdered formula to feed the child and insisted that it was decreasing the child's symptoms.

{¶9} Nurses repeatedly tried to explain to Father that the child's symptoms, including her ongoing weight loss, were caused by drug withdrawal, but Father refused to accept that explanation. Mother was less resistant to the nurses' explanations, but Father did most of the talking when the couple interacted with hospital staff. Prior to N.B.'s scheduled release day, Father insisted that the child was ready to go home. Nurses told him that N.B. was not ready to be released, but Father only became more hostile with the staff. Ultimately, one of the nurses contacted hospital security and Father was escorted out of the hospital.

{¶10} A nurse also reached out to the child's pediatrician and asked him to speak to Father. The pediatrician noted on day four of the child's hospital records that he told Father "as I

had said the last 2 days that the baby needs to stay at least 5 days for observation regarding withdrawal[.]" Father continued to insist that the child's symptoms were due to the formula that the hospital was feeding her and that he believed that the child was ready to be discharged. The doctor reiterated that the child was not medically ready for discharge.

{¶11} CSB attempted to arrange a meeting with the parents to discuss a safety plan for N.B. so the agency could avoid removing the child from her parents' custody but also ensure that she continued to receive appropriate care after discharge from the hospital. Father told the caseworker that he would not meet with CSB and would not comply with a voluntary safety plan, but that the agency would have to go to court. The intake caseworker called Mother, but Mother did not answer her phone or respond to the message left by the caseworker. A hospital social worker encouraged Mother to attend a scheduled meeting with the caseworker even though Father refused to attend, but Mother did not. Because the parents refused to work with CSB on a voluntary basis, and the agency was concerned about the patents' ability to care for their baby born with NAS, it filed an involuntary case.

{¶12} Prior to N.B.'s release from the hospital, CSB filed a complaint to allege that she was an abused and dependent child. An adjudicatory hearing was held before a juvenile court magistrate on February 14 and March 4, 2024. Following the hearing, the magistrate dismissed all allegations of abuse and the allegations of dependency under R.C. 2151.04(B) and found that N.B. was a dependent child under R.C. 2151.04(C).

{¶13} The trial court adopted that decision and later adopted the magistrate's subsequent decision to place N.B. in the temporary custody of CSB. Mother filed timely objections to the adjudicatory decision, raising similar arguments to those that she raises on appeal. The trial court overruled Mother's objections, adjudicated N.B. a dependent child, and continued her in the

temporary custody of CSB. Mother appeals and raises three assignments of error, which will be addressed out of order to facilitate review.

## II.

## **ASSIGNMENT OF ERROR II**

THE COURT'S FINDING OF DEPENDENCY WAS INSUFFICIENT, OR IN THE ALTERNATIVE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶14} Mother's second assignment of error challenges the weight of the evidence supporting the trial court's adjudication of her child as dependent under R.C. 2151.04(C). This Court reviews a manifest weight challenge to an adjudicatory finding as follows:

In determining whether the juvenile court's adjudication of dependency is against the manifest weight of the evidence, this court [reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed[.]

*In re R.R.*, 2023-Ohio-2941, ¶ 11 (9th Dist.).

{¶15} At the adjudicatory hearing, CSB was required to prove that N.B. was a dependent child by clear and convincing evidence. *See* Juv.R. 29(F); R.C. 2151.35(A)(1). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶16} The trial court adjudicated N.B. dependent under R.C. 2151.04(C), which defines a dependent child as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" A dependency finding under R.C. 2151.04(C) does not require a demonstration of parental fault. Instead, "the focus is on the child's

situation to determine whether the child is without proper or adequate care or support." *In re A.S.*, 2020-Ohio-1356, ¶ 10 (9th Dist.), quoting *In re I.T.*, 2016-Ohio-555, ¶ 32 (9th Dist.). CSB was required to demonstrate only that the parents' conduct had an adverse impact on N.B. "sufficient to warrant the State in assuming the child's guardianship." *In re O.H.*, 2011-Ohio-5632, ¶ 16 (9th Dist.).

{¶17} The trial court based its dependency finding, in part, on the fact Mother's prenatal drug use had caused N.B. to experience symptoms of drug withdrawal, which required specialized medical care and treatment. Medical personnel did not determine whether the baby was withdrawing from Mother's legal use of methadone, her illegal use of methamphetamine, or a combination of both. Nevertheless, N.B. required an extended post-birth hospital stay for medical professionals to continually monitor and treat her physical symptoms of drug withdrawal.

{¶18} CSB also presented evidence that the parents did not accept the child's NAS diagnosis and were not willing to work with hospital staff to learn how to appropriately care for their baby. CSB focused, in part, on the fact that Father insisted on feeding N.B. the powdered formula that he brought to the hospital, rather than the Similac Sensitive liquid formula provided by the hospital. Father's formula was also Similac Sensitive, but it was prepared from powdered formula mixed with water. Although CSB presented evidence that the hospital recommended the liquid formula it supplied for newborn babies, it failed to present evidence that Father's use of a powdered version of the same type of infant formula posed any actual risk to the child's health or safety.

{¶19} Nevertheless, the agency's evidence about Father's use of the powdered formula also included Father's statements that he believed that the liquid formula was causing the child to experience fussiness, irritability, and other symptoms of discomfort. A pediatrician and several

nurses repeatedly told Father that N.B. was suffering from NAS and experiencing symptoms of drug withdrawal, but he refused to accept that diagnosis or that the child required specialized monitoring and care to address that problem. Father refused to work with hospital personnel to learn how to appropriately care for his special needs infant, or to work with CSB on a safety plan to prevent the removal of N.B. from her parents' custody.

{¶20} Mother did not explicitly state her refusal to address her child's medical problem to hospital staff, but she also failed to work with nurses and other staff to educate herself about how to address her child's medical problem, despite repeated requests that she do so. Mother also failed to respond to requests from CSB that she meet with the caseworker to develop a safety plan to provide appropriate care for N.B. after the child's release from the hospital.

{¶21} Consequently, the trial court heard substantial evidence that N.B. was suffering from symptoms of drug withdrawal, but the parents refused to acknowledge the child's medical diagnosis or work with medical professionals or CSB staff to educate themselves to ensure that they could provide the infant with appropriate care. Mother has failed to demonstrate that the trial court lost its way in adjudicating N.B. a dependent child. Mother's second assignment of error is overruled.

### ASSIGNMENT OF ERROR I

> THE COURT ERRED IN ADMITTING THE AGENCY'S PROFFERED MEDICAL RECORDS.

{¶22} Mother's first assignment of error is that the trial court erred in admitting the medical records of Mother and N.B. from their hospital admissions at Summa Akron City Hospital at the time of N.B.'s birth. The trial court admitted the medical records under the hearsay exception for medical records set forth in Evid.R. 803(6). The admission of evidence, including business records under Evid.R. 803(6) "is generally within the sound discretion of the trial court, and a

reviewing court may reverse only upon the showing of an abuse of that discretion." *Peters v. Ohio State Lottery Comm.*, 63 Ohio St.3d 296, 299 (1992).

{¶23} Although Mother raises additional arguments on appeal to challenge the admissibility of this evidence, she stated only one basis for her objection during the hearing. Because Mother stated a specific basis for her objections, she has forfeited her right to raise the additional grounds she now asserts on appeal. *Somerick v. YRC Worldwide, Inc.*, 2020-Ohio-2916, ¶ 13 (9th Dist.). At the hearing, Mother objected to the admission of the hospital records as business records under Evid.R. 803(6) because they were not properly authenticated through witness testimony.

{¶24} In response to Mother's objection, all other parties agreed that the medical records of Mother and N.B. were admissible as business records under Evid.R. 803(6), a hearsay exception that allows the admission of:

> A . . . record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the . . . record, or data compilation [ ].

{¶25} The hospital records in this case were authenticated by certification under R.C. 2317.422(A), which allows that, in lieu of testimony from a records custodian from the facility, hospital records may be authenticated by a proper certification that the records were prepared in the usual course of business of the institution. Mother's and N.B.'s hospital records that were admitted in this case each included a certification page signed by a "Manager of Release of Information at Summa Health System" and indicated in detail that the records complied with all the requirements of Evid.R. 803(6), including that they were prepared by persons with knowledge,

at or near the time of the events and acts noted, and that the records were prepared in the regular course of the hospital's business activity and practice to record such events.

**{¶26}** Consequently, Mother has failed to demonstrate that the trial court abused its discretion by admitting the certified hospital records of Mother and N.B. Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE COURT ERRED IN FINDING REASONABLE EFFORTS TO PREVENT REMOVAL.

**{¶27}** Mother's final assignment of error is that the trial court erred in finding that CSB made reasonable efforts to prevent the removal of N.B. from the parents' custody. Mother does not challenge the agency's efforts to prevent the ongoing removal of N.B. up to the time of the adjudicatory hearing two months later, but only the agency's efforts to prevent the initial removal of N.B. on December 6, 2023, upon her discharge from the hospital.

**{¶28}** Mother affirmatively waived this challenge, however, during her appearance at the shelter care hearing. The day after N.B. was released from the hospital and placed in the emergency temporary custody of CSB, the trial court held a shelter care hearing. Mother appeared at the hearing with counsel, waived her right to a contested hearing, and stipulated that there was probable cause for the removal of the child from her custody and that CSB had made reasonable efforts to prevent that removal. The magistrate journalized Mother's waiver in the shelter care order and Mother did not challenge those findings by moving to set aside that order. *See* Juv.R. 40(D)(2)(b). Consequently, the magistrate's unchallenged shelter care order demonstrates that Mother affirmatively waived this issue.

**{¶29}** Because Mother affirmatively waived any objection to the agency's reasonable efforts to prevent the removal of N.B. from her custody, she may not assert this error on appeal. *State v. Fitzgerald*, 2007-Ohio-701, ¶ 8 (9th Dist.). Mother's third assignment of error is overruled.

III.

**{¶30}** Mother's assignments or error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

STEVENSON, J.
CONCURS.

FLAGG LANZINGER, P. J.
CONCURS IN JUDGMENT ONLY.


APPEARANCES:

ANDREW KARAS and BRITTANY PELLERIN, Attorneys at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

MARK SWEENEY, Attorney at Law, for Appellee.

SHUBHRA AGARWAL, Guardian ad Litem.