[Cite as *In re A.C.*, 2025-Ohio-3135.]

STATE OF OHIO          )          IN THE COURT OF APPEALS
                       )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT       )

IN RE: A.C.                       C.A. Nos.    31342
    G.C.                                   31343
    S.G.                                   31344


                                  APPEAL FROM JUDGMENT
                                  ENTERED IN THE
                                  COURT OF COMMON PLEAS
                                  COUNTY OF SUMMIT, OHIO
                                  CASE Nos.    DN 24-05-00343
                                               DN 24-05-00344
                                               DN 25-04-00345

DECISION AND JOURNAL ENTRY

Dated: September 3, 2025

---

CARR, Judge.

{¶1}   Appellant, M.B. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that adjudicated her three minor children dependent, and continued the oldest two in the temporary custody of their father and the other child in the temporary custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2}   Mother is the biological mother of A.C., born July 6, 2013; G.C., born May 28, 2018; and S.B., born February 10, 2020. Father C. is the biological father of A.C. and G.C. Father P. is the only man alleged to be the biological father of S.B. Neither father filed a brief in this appeal.

{¶3} On October 19, 2023, Father P. was arrested for domestic violence against Mother. Mother reported that Father P. had grabbed her by the hair and dragged her across the room. According to the sheriff's deputy who responded to Mother's 911 call, Mother was visibly shaken, had red marks on her face, and was missing some hair. Father P. was later convicted of felony domestic violence, and the criminal court issued a no contact order between Father P. and Mother.

{¶4} CSB became involved with this family during March 2024. Mother had called for assistance at her home because she believed that people had placed cameras in several electronic devices in her home. The sheriff's deputy who responded to Mother's home ascertained that there were no cameras in Mother's devices, but he was unable to convince her of that fact. Consequently, he called the fire department for assistance because he believed that Mother was expressing delusional thoughts. The fire department transported Mother to the hospital, where she was involuntarily admitted for a psychiatric evaluation. The children were present in the home at that time, but Mother agreed to allow them to stay with a neighbor, who had been deemed suitable by the sheriff's department.

{¶5} Few details about the March 2024 case are included in this record. A CSB witness explained that the agency was concerned at that time that Mother's admitted history of methamphetamine use and/or undiagnosed mental illness caused her to behave irrationally and that her erratic behavior posed a risk to the safety and wellbeing of her children. It is unclear whether the children were removed from Mother's custody, how long Mother was hospitalized that time, or whether she received mental health and/or substance abuse treatment. CSB closed that case less than two months later because Mother tested negative for drugs and CSB believed that her behavior had become more stable.

{¶6} Shortly afterward, however, Mother took the children to a hospital emergency department for testing and treatment because she believed that they had been poisoned. Mother reported to hospital personnel that she had thrown out most of the food in the home and would not allow the children to drink the water or use it to brush their teeth because someone was sneaking into her home and poisoning the food and water. Hospital personnel determined that the children had not been poisoned. Instead, they were concerned about Mother's mental state because she seemed to be behaving irrationally. Mother was admitted for an involuntary three-day psychiatric evaluation and Mother's adult child came to pick up the children.

{¶7} While Mother was hospitalized for three days, CSB was unable to speak to her but learned that she had tested positive for methamphetamine. Mother later admitted to the caseworker that she had again relapsed and used methamphetamine and was regularly drinking alcohol. Mother did not disclose any more information, and her hospital records were not admitted into evidence. Consequently, the record does not reveal any further details about Mother's psychiatric hospitalization.

{¶8} The intake caseworker spoke to the older two children and the mother of Father P. ("Grandmother P."), who often assisted Mother because Mother has a serious visual impairment and cannot drive. Grandmother P. and the two older children confirmed that, for an extended period of time, the children had been exposed to Mother's behavior of repeatedly expressing her irrational beliefs that people were spying on them through the windows, the children's toys, and electronic devices in the home; and that people were sneaking into the home to spy on them or poison their food and water. Mother had also taken actions to address her irrational concerns by placing layers of curtains over all the windows and throwing out large quantities of food, electronic devices, and toys that she believed had been poisoned or bugged. Based on her investigation, the

intake caseworker had concerns about the children's wellbeing because they were frightened by Mother's behavior and had even begun to believe some of what Mother was telling them.

{¶9} The caseworker also spoke to Father P. He admitted that he continued to have contact with Mother, in violation of the no contact order. Despite his conviction of felony domestic violence, he denied that he ever perpetrated violence against Mother. Mother also admitted that she and Father P. continued to have ongoing contact. In addition to Grandmother P., Mother also relied on Father P. for transportation.

{¶10} On May 24, 2024, CSB filed a complaint, alleging that A.C., G.C., and S.B. were abused, neglected, and dependent children. The factual allegations were that the children were living in an unsuitable environment because they were exposed to Mother's ongoing irrational behavior (caused by drug abuse and/or untreated mental illness) as well as domestic violence perpetrated by Father P. against Mother. Following an adjudicatory hearing, the trial court adjudicated the children dependent under R.C. 2151.04(B) and (C). The trial court later placed A.C. and G.C. in the temporary custody of Father C. and placed S.B. in the temporary custody of CSB.

{¶11} Mother filed objections to the adjudicatory decision, which were overruled by the trial court. The trial court adjudicated the children dependent under R.C. 2151.04(B) and (C) and continued them in their temporary placements. Mother appeals and raises two assignments of error, which will be addressed together because they are closely related.

II.

**ASSIGNMENT OF ERROR I**

THE DEPENDENCY ADJUDICATIONS ARE SUPPORTED BY INSUFFICIENT EVIDENCE.

## ASSIGNMENT OF ERROR II

THE ADJUDICATIONS ARE AGAINST THE MANIFEST WEIGHT OF THE
EVIDENCE.

{¶12}  Mother's assignments or error are that the dependency adjudications were not supported by sufficient evidence and/or were against the manifest weight of the evidence.  This Court's review under the sufficiency of the evidence standard requires us to "examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof."  *In re Z.C.*, 2023-Ohio-4703, ¶ 12, quoting *Cross v. Ledford*, 161 Ohio St. 469, 470 (1954).  From the adjudicatory hearing evidence, the trial court was required to determine that CSB established the adjudication of dependency by clear and convincing evidence.  *In re H.P.*, 2022-Ohio-778, ¶ 28, (9th Dist.), citing *In re I.K.-W.*, 2019-Ohio-2807, ¶ 17 (9th Dist.); R.C. 2151.35(A)(1); and Juv.R. 29(E)(4).  Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross*, 161 Ohio St. 469, at paragraph three of the syllabus.

{¶13}  When reviewing whether an adjudication of dependency is against the manifest weight of the evidence:

> this court [reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed[.]

*In re N.B.*, 2025-Ohio-528, ¶ 14 (9th Dist.).

{¶14}  The trial court adjudicated A.C., G.C., and S.B. dependent under R.C. 2151.04(B) and 2151.04(C), which alternatively define a dependent child as one:

> (B) Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian; [or]

> (C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]

Under either of these definitions of a dependent child, the focus is not on parental fault, but rather upon "the child's situation to determine whether the child is without proper (or adequate) care or support." *In re Riddle*, 79 Ohio St.3d 259, 262 (1997). "Adequate parental care" is defined as "the provision by a child's parent . . . of adequate food, clothing, and shelter to ensure the child's health and physical safety[.]" R.C. 2151.011(B)(1). Part of Mother's argument points to evidence that the family home appeared to be suitable, and the children appeared to be healthy, suggesting that there was no proof that they lacked adequate parental care. Nevertheless, "simply because a child's physical needs are being met and a home is clean does not preclude a juvenile court from finding a child dependent." *In re Y.R.*, 2021-Ohio-1858, ¶ 59 (12th Dist.).

{¶15} In addition to the physical condition of the home and the children, a finding of dependency focuses "on the child[ren's] situation to determine whether [they are] without proper or adequate care or support." *In re A.S.*, 2020-Ohio-1356, ¶ 10 (9th Dist.), quoting *In re I.T.*, 2016-Ohio-555, ¶ 32 (9th Dist.). Dependency is often proven by circumstances in which children are repeatedly exposed to dangerous or unusual circumstances in the home that pose a risk to their physical and/or emotional safety and wellbeing. *See, e.g.*, *In re G.G.*, 2022-Ohio-1654, ¶ 29 (9th Dist.).

{¶16} Mother also asserts that the children were not without adequate parental care because, at the time she was admitted to the hospital for psychiatric treatment, her adult daughter (a suitable caregiver) was available to take her children. Mother mischaracterizes the allegations in CSB's complaint as being based on her temporary unavailability to care for the children for the three days that she was hospitalized. Unlike the case law upon which Mother relies, CSB's

dependency allegations were not premised on Mother's temporary unavailability to care for the children. *See*, *e.g.*, *In re O.V.*, 2024-Ohio-2620, ¶ 30 (9th Dist.).

{¶17} Instead, the agency focused on the children's ongoing exposure to Mother's erratic behavior, believed to be caused by substance abuse and/or untreated mental illness, and alleged that her behavior was threatening the safety and wellbeing of her children. It also based the complaint on the children's repeated exposure to domestic violence perpetrated by Father P. against Mother. CSB presented some evidence about the children's exposure to domestic violence perpetrated by Father P. against Mother, but it was limited. There was no evidence about specific incidents of domestic violence witnessed by the children, but the older children told the caseworker that they were afraid of Father P. because they had seen him hit Mother and that "they've had to lock themselves in closets before due to the fighting."

{¶18} Most of CSB's evidence at adjudication focused on Mother's ongoing erratic conduct in the presence of the children in response to her irrational beliefs that people were spying on the family and poisoning them. Mother argues that, to prove that her conduct resulted from a "mental condition" under R.C. 2151.04(B), CSB was required to, but did not, present expert evidence that Mother had been diagnosed with a mental illness. She cites no legal authority to support this argument, and this Court is not aware of any.

{¶19} To require the agency to present evidence of a professional mental health diagnosis at the adjudicatory hearing would place an unreasonable burden on the agency. Prior to the adjudication of the children, without an express waiver by Mother, the agency and trial court lacked access to Mother's hospital records because they were privileged. *See In re L.F.*, 2014-Ohio-3800, ¶ 38 (9th Dist.), citing R.C. 2317.02(B)(1)(b) and Juv.R. 32. Moreover, Mother had been involuntarily hospitalized on two separate occasions in March and May 2024, not because of

any confirmed mental health diagnosis, but because of the erratic behavior she was displaying and the apparent threat that her behavior posed to the safety of herself and others. *See* R.C. 5122.01(A); 5122.01(B) (defining mental illness for purposes of involuntary hospitalization with focus on the manifestation of mental illness through irrational, threatening, or otherwise dangerous behavior).

{¶20} In fact, this Court has explicitly recognized that a parent's "mental condition" for purposes of R.C. 2151.04(B) may be demonstrated through the parent's erratic or harmful behaviors, including ongoing drug abuse or continually exposing the children to a domestically violent partner. *See In re J.M.*, 2023-Ohio-1206, ¶ 11 (9th Dist.); *In re L.R.*, 2019-Ohio-1152, ¶ 31-33 (9th Dist.); *see also Disciplinary Counsel v. Wickerham*, 2012-Ohio-2580, ¶ 9 (explicitly recognizing that ongoing drug abuse can impair one's "mental condition"). In compliance with this line of case law, the focus of CSB's evidence at the adjudicatory hearing was on the behavioral component of Mother's mental condition and the negative impact that it had on the home environment of A.C., G.C., and S.B.

{¶21} CSB presented undisputed evidence that Mother's ongoing erratic behavior, whether caused by her admitted use of methamphetamine and/or a diagnosed or undiagnosed mental illness, posed a significant threat to the safety and wellbeing of the children who resided in her sole custody. Primarily through the testimony of the caseworker and Grandmother P., CSB established that Mother had repeatedly told the children that people had been breaking into the house and planting listening devices, so Mother had thrown away many of the electronic devices and toys in the home. She also told the children that they were being watched through the windows, so Mother covered all the windows with layers of fabric and removed many of the light bulbs. Additionally, she had recently told them that their food and water was poisoned so she discarded most of the food in the home and would not allow the children to drink the water or

brush their teeth. Mother blamed most of the alleged acts of spying and poisoning on Father P. and/or Grandmother P.

{¶22} Because Grandmother P. often provided transportation and childcare for the family, she had observed Mother's behavior with the children for several years. Mother told Grandmother P. that she believed either Grandmother P. or Father P. had been spying on her and "hacking her phone, her computer, her internet, her TV, the toys, [and] the microwave[.]" Grandmother P. observed that Mother had discarded many of those items. Grandmother P. explained that she had observed Mother exhibit similar erratic behavior "off and on for four years[.]" She expressed particular concern that Mother had told the children that Grandmother P. had poisoned them and/or was spying on them and that the children had started to believe her. Grandmother P. sensed that the children had recently become afraid of her.

{¶23} The caseworker testified about her interviews of the two older children. As Grandmother P. had observed, the children reported to the caseworker that Mother repeatedly told them that Grandmother P. and/or Father P. were spying on them and/or poisoning their food and that Mother had taken drastic actions to address her unfounded concerns. More significantly, A.C. and G.C. reported that Mother told them that Grandmother P. was going to kill them and take S.B. so that Mother would be alone.

{¶24} At points during the interviews, the children indicated that they believed that Grandmother P. and/or Father P. had spied on them or tried to poison them. The children also told the caseworker that sometimes they knew that Mother was not telling the truth, such as when she insisted that Grandmother P. was hiding in the bathtub, but they could see that she was not there. When they realized that Mother was sometimes imagining things, the children "started to just agree with mom . . . out of fear that mom would get angry if they didn't."

**{¶25}** The caseworker expressed serious concern about the traumatic effect of Mother's unstable behavior on the children's own mental health. The children expressed fear of Mother but also were concerned about "whether she was going to be okay or not." The oldest child, then less than 11 years old, further informed the caseworker that Mother would often stay up all night and then sleep all day, so she had to clean the house and cook for her younger siblings, then ages 4 and almost 6 years old.

**{¶26}** Given all of this evidence about Mother's erratic behavior around the children, CSB presented sufficient evidence to establish clearly and convincingly that these children were dependent children under R.C. 2151.04(B) and 2151.04(C) because they lacked adequate parental care because of Mother's mental condition and their home condition or environment warranted the state in assuming their guardianship. Because the witness testimony was not disputed and cross-examination of the witnesses did not question their credibility, the trial court did not lose its way in adjudicating the children dependent under each of these subsections. Mother's assignments of error are overruled.

### III.

**{¶27}** Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

FLAGG LANZINGER, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

ANDREW KARAS, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and AARON B. CAMPBELL, Assistant Prosecuting Attorney, for Appellee.

STEPHEN M. GRACHANIN, Attorney at Law, for Appellee.

ANTHONY COSTELLO, Attorney at Law, for Appellee.

JOSEPH KERNAN, Guardian ad Litem.